# UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY



MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ 07101-0419
**(973) 645-6340**

**WILLIAM J. MARTINI**
    **JUDGE**

## LETTER OPINION

July 10, 2008

Mark Lawrence
Forman & Cardonsky
125 Broad Street
Elizabeth, NJ 07201
    (*Attorney for Plaintiffs*)

Leah Bynon
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
    (*Attorney for Defendants Corey Handy and Julian Hilongos*)

Robert Varady
LaCorte, Bundy, Varady & Kinsella
989 Bonnel Court
Union, NJ 07083
    (*Attorney for Defendants Keith Johnson, Christopher Gulbin, and County of Union*)

    Re:    *Love. v. Johnson, et al.*
           Civil Action No. 07-1045 (WJM)

Dear Litigants:

    This matter comes before the Court upon a Motion for Summary Judgment filed by Defendants Union County, Keith Johnson, and Christopher Gulbin (collectively, "Union County Defendants") and a Motion to Dismiss, or Alternatively, Motion for Summary Judgment filed by Defendants Corey Handy and Julian Hilongos (collectively, "Federal Defendants"). There was no oral argument. Fed. R. Civ. P. 78. For the reasons set forth below, Defendants' motions are **DENIED IN PART** and **GRANTED IN PART**.

## I.  BACKGROUND[1]

### A.  Arrest of Eric Love

On November 9, 2004, Defendant Gublin of the Union Country Prosecutor's office obtained a "knock and announce" search warrant at a residence located in Irvington, New Jersey.  (Union County Defs.' Br. Ex. B)  The warrant was issued in connection with an investigation of the criminal activities of Eric Love, who was arrested and placed into custody for conspiring to distribute heroin and Oxycontin on November 10th around 8:20 P.M.  (Pls.' Opp. Br. 3; Union County Defs.' Br. Ex. B.)

### B.  Execution of the Search Warrant

Approximately an hour after Eric Love's arrest, a team of six officers, Defendants Johnson, Hilongos, Manghisi, Demeter, Wikander, and Handy, arrived at the Irvington residence to execute the search warrant.  (Pls.' Opp. Br. 4).  Plaintiffs allege that the police knocked loudly on the door, and when asked who was at the door, identified themselves as police officers and threatened to break down the door if it was not opened. (W. Love Cert. ¶10).  Within five to ten seconds, Wynette Love, a resident and one of the plaintiffs in this suit, went to open the door.  (W. Love Cert. ¶ 11.)  Upon turning the doorknob, the door was forced opened by Defendant Hilongos, pushing Wynette Love backwards.  (W. Love Cert. ¶11).

The six officers entered the residence with their guns drawn.  (Pls.' Opp. Br. 4-5). There were seven individuals present in the home at the time: Wynette Love, Jahyde Love, Naderia Love, Satasha Love, Margaret Love, Henry Cobb, and Quiyim Robinson. (Union County Defs.' Br. Ex. E).  From the entry hallway, it is alleged that Defendant Hilongos could see the decedent, Margaret Love, and Quiyim Robinson in the kitchen. (W. Love Cert. ¶ 13.)  Defendant Hilongos asked Wynette Love whether any other people were present.  (W. Loves Cert. ¶ 13.)  She responded that her sister, son, and niece were upstairs, and three of the officers rushed upstairs.  (W. Love Cert. ¶ 13.)

Wynette Love then proceeded to engage the remaining three officers in a conversation about their presence in the residence.  (W. Love Cert. ¶ 15.)  She was told by the officers that they were from the Union County Prosecutor's office and had a search

---

[1] Pursuant to Fed. R. Civ. P. 12(d), the Court will treat Federal Defendants' motion as a motion for summary judgment.  Plaintiffs had a reasonable opportunity to present all of the material that they believed to be pertinent to the motion and provided a certification by Wynette Love.  Thus, in addition to the Complaint, the Court reviewed the documents submitted by the parties in their moving papers.

warrant for the premises. (W. Love Cert. ¶ 15.) They informed her that her brother, Eric Love, was in custody for transporting drugs and that they were searching the house in connection with the arrest. (W. Love Cert. ¶ 15.) The officers inquired if Eric Love stored any items at the residence, and she responded that they should look in an upstairs closet. (W. Love Cert. ¶ 15.) A .40 caliber handgun along with ammunition were ultimately found among and seized from Eric Love's possessions. (Union Count Defs.' Br. Ex. E.)

### C. Death of Margaret Love

Sixty-one-year-old Margaret Love, a resident of the Irvington home, suffered from several health problems, including asthma, obesity, and heart disease. (W. Love Cert. ¶ 8.) She could only walk around with the aid of a walker or by leaning on furniture. (W. Love Cert. ¶ 8.) Furthermore, she took numerous medications and was additionally treated with a combination of a nebulizer, a portable machine that administers medicine through inhaled vapors, and a stationary oxygen machine. (W. Love Cert. ¶ 8-9.)

When the officers first entered the residence, Margaret Love, was seated at the kitchen table with Quiyim Robinson making party favors. (W. Love Cert. ¶ 7.) She was wearing an oxygen mask connected to a stationary oxygen machine. (W. Love Cert. ¶¶ 7, 9, 13). Margaret Love's oxygen machine was located on the rear wall of her bedroom and was connected to an oxygen mask by a ten-foot long clear plastic tube. (W. Love Cert. ¶ 9.) The oxygen machine allowed Margaret Love to walk around the kitchen and her bedroom (a converted dining room). (W. Love Cert. ¶ 9.) Due to the limited reach of the machine, she could not travel to the living room, bathroom, or entrance hall without disconnecting herself from the machine. (W. Love Cert. ¶ 9.)

After the officers had gathered the second floor residents to the living room, the officers told everyone to move to the living room. (W. Love Cert. ¶ 16.) Wynette Love alleges that she "told them that [her] mother was sick and suffered from chronic asthma," but that the officers "insisted that she move." (W. Love Cert. ¶ 16.) Margaret Love removed her oxygen mask, and began to move towards the living room. (W. Love Cert. ¶ 17.) She was not permitted to use her walker. (W. Love Cert. ¶ 17.) Wynette Love states that Margaret Love, on her way to the living room, sat down in her bedroom to start using her nebulizer with Wynette Love's assistance, because she became breathless and very distressed. (W. Love Cert. ¶ 17.) Wynette Love alleges that "despite [her] repeated protests, the officers would not permit her to continue on the nebulizer repeating '[w]e need her to come in here,' and 'Ma'am, come in here.'" (W. Love Cert. ¶ 17.) Therefore, Margaret Love did not receive her usual seven to ten minutes of treatment and only received a few seconds of treatment. (W. Love Cert. ¶ 17.)

Margaret Love appeared to be in distress when she arrived in the living room, and Wynette Love requested numerous times for the officers to allow Margaret Love to use her nebulizer. (W. Love Cert. ¶ 18.) Margaret Love's condition continued to deteriorate. The officers permitted two of the residents to get the nebulizer from the bedroom after about twenty or thirty minutes of Margaret Love's removal from her oxygen mask. (W. Love Cert. ¶ 21.) At some point during this period, it is alleged that the officers would not let Wynette Love's son call 911, and that Quiyim Robinson surreptitiously called 911. (W. Love Cert. ¶ 23.)

The 911 call recordings make clear that one of the police officers called for an ambulance, and then called twice more to check on the status of the ambulance. (Bynon Decl. Ex. B.) Also, the 911 recording notes that sometime after the police officers called for an ambulance, Robinson called for an ambulance and was told that one was already on the way. (Bynon Decl. Ex. B.) Robinson communicated with the other occupants in the living room and relayed the 911 call operators' instructions to remain calm. (Bynon Decl. Ex. B.) Margaret Love by that point was using her nebulizer and was conscious. (Bynon Decl. Ex. B.)

Margaret Love, however, did not improve with the nebulizer. Wynette Love alleges that it was "several minutes" before the ambulance arrived. (W. Love Cert. ¶ 23.) The paramedics arrived at 10:30 P.M. and began to treat Margaret Love, who lost consciousness and began to seize and vomit after their arrival. (Pls.' Opp. Br. ¶ 25; Union County Defs.' Br. Ex. E.) She was transported to Newark Beth Israel Medical Center, where she was pronounced dead at 11:03 P.M. (Pls.' Opp. Br. ¶ 26.)

### D. The Complaint and Procedure

On November 13, 2006, Plaintiffs, the Estate of Margaret Love and her family members, filed this Complaint in New Jersey state court. They allege violations of Margaret Love's constitutional rights by (1) Defendants' failure to abide by the "knock and announce" warrant, (2) Defendants' unreasonable search and seizure; and (3) Defendants' use of excessive force. Plaintiffs also allege violations of state tort laws.

The Attorney General certified that Defendants Hilongos (a deputized DEA agent) and Handy (a DEA agent) were acting within the scope of their federal employment. Thereafter, Defendants removed this case to federal court, and filed the present motions in August 2007.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment eliminates unfounded claims without resorting to a costly and lengthy trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). However, a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex*, 477 U.S. at 323. A litigant may discharge this burden by exposing "the absence of evidence to support the nonmoving party's case." *Id.* at 325. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The substantive law determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* No issue for trial exists unless the non-moving party can demonstrate sufficient evidence favoring it such that a reasonable jury could return a verdict in that party's favor. *Id.* at 249.

### B. Qualified Immunity

Union County and Federal Defendants both assert theories of qualified immunity. In examining whether the officers are entitled to qualified immunity, courts must undertake a two-part inquiry.[2] First, the Court must determine whether the conduct alleged by Plaintiffs violated a constitutional right. *Scott v. Harris*, 127 S.Ct. 1769, 1774, 167 L.Ed. 2d 687 (2007). In other words, was the defendant's conduct "reasonable in light of the facts and circumstances available to the officer at the time." *Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007). Second, if the Court concludes that there was a violation of a constitutional right, the Court must then examine whether the unlawfulness

---

[2] Qualified immunity analysis is the same under either *Bivens* or 42 U.S.C. § 1983 claims. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999).

of the action would have been clear to an objectively reasonable officer in light of the specific context of the situation. *Id*. This second stage of the inquiry requires a review of whether "the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit." *Id*.

In this case, Plaintiffs' allege violations of the Fourth Amendment right to be free from unreasonable search and seizure resulting from Defendants' restrictions of movement and Defendants' failure to knock and announce.[3] With regards to the restriction of movement claim, Plaintiffs specifically allege that the following acts were objectively unreasonable and a violation of Plaintiffs' Fourth Amendment rights: (1) requiring Margaret Love to disconnect from her oxygen mask and move from the kitchen to the living room; (2) initially refusing to allow a family member to retrieve Margaret Love's nebulizer from her bedroom; and (3) prohibiting the initial phone call to 911.

       1.    *Unreasonable restrictions in movement*.

The Fourth Amendment protects against unreasonable searches and seizures. A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *Leveto v. Lapina*, 258 F.3d 156, 166 (3d Cir. 2001)(citation omitted). Not every seizure, however, constitutes a violation of the Fourth Amendment.

Courts have generally recognized that a search warrant implicitly carries with it some limited authority to detain the occupants of the premises when it is justified by law enforcement interests, such as preventing flight, minimizing risk of harm to police officers, and the orderly completion of the search. *See Michigan v. Summers*, 452 U.S. 692, 705 (1981); *see also Leveto*, 258 F.3d at 167. This authority must be exercised in an objectively reasonable manner and is determined on the basis of the facts and circumstances confronting the officers at the time of the detention. *See Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985).

In this case, viewing the evidence more favorably for the non-moving party, Defendants' restriction of the occupants' movements to the living room falls squarely within the Fourth Amendment concept of seizure. (W. Love Cert. ¶¶ 16-17.) Thus, the Court must determine whether Defendants' seizure of Margaret Love and the other occupants was objectively reasonable and justified in light of the particular circumstances of this case. As Plaintiffs do not contest the validity of the search warrant, the Court's

---

[3] Plaintiffs have stated that they do not assert any claims for failure to provide medical care under the Fourteenth Amendment. (Pls.' Opp. Br. 10-11.) Additionally, Plaintiffs do not appear to oppose Defendants' motions for summary judgment on the excessive force claims.

focus is in balancing the "incremental intrusion on personal liberty" against the officers interests in "preventing flight in the event that incriminating evidence is found," "minimizing the risk of harm to the officers," and facilitating "the orderly completion of the search." *Michigan*, 452 U.S. at 702-703.

Upon review of the submissions of the parties, the Court cannot conclude that Defendants are entitled to qualified immunity at this time. It is undisputed that the police officers were executing the search warrant after placing the suspect, Eric Love, in custody. It is also alleged that Defendants were aware that Eric Love usually stayed in a different location. (W. Love Cert. ¶ 15.) The officers were informed by Wynette Love that Eric Love kept his clothes in a second floor hall closet. (Bynon Decl. Ex. A.) Therefore, there was less urgency in evidence preservation or the prevention of flight.

Furthermore, the risk of harm to the officers was minimized by the ratio of six officers dealing with seven occupants, including two children and Margaret Love. (W. Love Cert. ¶ 7, 11.) Also, there is no allegation or evidence presented by Defendants that the occupants were combative or uncooperative. Thus, there is nothing to suggest that the officers felt clearly outnumbered, overwhelmed, or in immediate danger.

Most importantly, there was the existence of a special circumstance which rendered the detention and restriction of the occupants to the living room unreasonable – namely, that Margaret Love required the medical assistance of an oxygen machine and nebulizer. The parties provide varying accounts of whether: (1) Defendants were aware of Margaret Love's medical condition; (2) Defendants saw that Margaret Love was using her oxygen mask when the officers decided to direct the occupants of the home into the living room; and (3) the occupants of the home were prevented for a time from leaving the living room to retrieve Margaret Love's nebulizer. These facts would bear heavily in the Court's analysis of the reasonableness of the Defendants' conduct in this case. Thus, the Court concludes that there are material issues of fact in dispute, and therefore, summary judgment on the issue of qualified immunity must be denied.

        2.    *Failure to "knock and announce."*

The Fourth Amendment requires that police officers knock and announce their identity and purpose before attempting forcible entry, absent exigent circumstances. *See Kornegay v. Cottingham*, 120 F.3d 392, 396-97 (3d Cir. 1997)(citations omitted). Furthermore, the officers must give the occupants a reasonable time to answer the door before attempting forcible entry. *See United States v. Banks*, 540 U.S. 31, 38-39, 124 S. Ct. 521, 157 L. Ed. 2d 343 (2003).

In this case, Defendants pursuant to a knock and announce warrant did knock on the door and announce their presence.[4] (W. Love Cert. ¶ 10.) Within five to ten seconds after knocking, Wynette Love turned the handle to open the door. (W. Love Cert. ¶ 11.) Simultaneously, the officers are alleged to have pushed against the door. (W. Love Cert. ¶ 11.) The Court finds that there was no forcible entry, as Plaintiffs' own certification states that Wynette Love opened the door. Thus, the Court will dismiss Plaintiffs' claim that Defendants failed to knock and announce in violation of the Fourth Amendment.

### C. Claims against Hilongos and Handy in their Official Capacities

Federal Defendants assert that as federal agents, Plaintiffs' constitutional law claims, *i.e. Bivens* claims, against them in their official capacities should be dismissed.[5] *See Mierzwa v. United States*, No. 07-3362, 2008 U.S. App. LEXIS 13523 *8-9 (3d Cir. June 26, 2008)(no express waiver of sovereign immunity in constitutional claims). Claims involving violations of constitutional rights cannot be stated against federal law enforcement officers in their official capacities as they are indistinguishable from claims against the governmental agency. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). Therefore, the Court will dismiss the claims against Federal Defendants in their official capacities.

### D. State Law Claims

The Federal Tort Claims Act ("FTCA") waives sovereign immunity in limited circumstances. 28 U.S.C. §§ 2671, *et seq*. In addition to other requirements, a plaintiff is barred from filing a suit under the FTCA unless a claim is first filed with the appropriate federal agency. 28 U.S.C. § 2675. Federal Defendants argue that Plaintiffs' state law tort claims against them should be dismissed, because Plaintiffs failed to comply with all of the procedural requirements of the Federal Tort Claims Act. As Plaintiffs failed to

---

[4] Although Plaintiffs' Opposition Brief argues that the officers did not announce their presence, Wynette Love's Certification makes clear that the officers knocked and announced their presence prior to entry. (W. Love. Cert. ¶ 10.)

[5] Plaintiffs assert that it is a question of fact whether the Federal Defendants were acting under color of federal law. Although Plaintiffs are correct that the Attorney General's certification of Federal Defendants' actions as "within the scope of his [federal] employment" is not binding on the Court beyond removal, Plaintiffs have not cited any case law to suggest that a DEA agent and a deputized federal agent are deprived of their authority to act under color of federal law by virtue of collaboration with local police officers. Thus, the Court concludes that the Federal Defendants were acting under color of federal law.

oppose the dismissal of these claims on the grounds of compliance with the FTCA,[6] the Court will dismiss the state law claims against the Federal Defendants.

### E. Supervisory Liability for Defendants Union County and Christopher Gublin

Defendants Union County and Gublin argue that Plaintiffs by merely alleging respondeat superior liability have failed to allege a cause of action under 42 U.S.C. § 1983. Plaintiffs contend that they have sufficiently alleged that Union County and Gublin had "a duty to provide training and supervision to the individual named Defendants regarding the execution of search warrants and the constitutional rights and safety of the public." (Pls.' Opp. Br. 23.) With regards to Defendant Union County, such a generalized pleading asserting a general duty to provide training and supervision along with only allegations of one specific incidence of a constitutional violation cannot establish either a policy, practice, or custom or evidence a deliberate and conscious choice. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989)(citations omitted). With regards to Defendant Gublin, Plaintiffs only allege that he filed for the search warrant and was responsible for the training, supervision, and conduct of other officers. (Compl. ¶ 13.) There is no allegation that Defendant Gublin was remiss in submitting the search warrant, and further, there is no allegation that he was personally involved in the violation of Margaret Love's rights. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Thus, the Court will grant Defendants' motion to dismiss the 42 U.S.C. § 1983 claims as against Defendants Union County and Gublin.

### III. CONCLUSION

After consideration of the parties' submissions, the Court finds that there are some genuine issues of material fact in dispute. Accordingly, Defendants' motions for summary judgment are **DENIED IN PART** and **GRANTED IN PART**. An appropriate order follows.

s/William J. Martini  
**William J. Martini, U.S.D.J.**

---

[6] Plaintiffs argue that it is a question of fact whether Federal Defendants were acting as federal or state employees. Defendant Handy is employed as a federal DEA agent, and Defendant Hilongos was deputized as a task force officer for the DEA under 21 U.S.C. § 878(a). For purposes of the FTCA, both officers are considered federal employees. 28 U.S.C. § 2671; 5 U.S.C. § 3374(c).